Howard GACKSTETTER, Relator,

v.

JOHNSON/MIDWEST COCA COLA BOTTLING, Self–Insured, Respondent,

and

State Treasurer, Custodian of the Special Compensation Fund, Respondent.

No. C9–93–1194.

Supreme Court of Minnesota.

Jan. 14, 1994.

Jane McMahon, Horvei, Gubbe & Krueger, P.A., Roseville, for relator.

John T. Thul, Cousineau, McGuire & Anderson, Minneapolis, for Johnson/Midwest Coca Cola Bottling.

Sara J. Stoltman, St. Paul, for State Treasurer, Custodian of the Special Compensation Fund.

COYNE, Justice.

The Workers' Compensation Court of Appeals reversed an award of economic recovery compensation, holding that if a post-injury job resulting from rehabilitation efforts is consistent with a rehabilitation plan, it meets the criteria of Minn.Stat. § 176.101, subd. 3e(b) (1992). We reverse and remand to the compensation judge for further proceedings.

Howard Gackstetter was a route delivery driver for Midwest Coca Cola when he sustained a series of low back injuries for which he ultimately received impairment compensation for a 14% whole body impairment and was registered with the Special Compensation Fund. On October 24, 1989, he sustained a fourth low back injury, also rated at 14%. As a result of his last injury, he was unable to return to work for Coca Cola and was assigned a Qualified Rehabilitation Consultant who recommended retraining in computer-assisted design (CAD). All parties agreed this retraining proposal was appropriate, and employee took a six-month course, which cost about $6,000, in the operation of a CAD data base followed by a three-month on-the-job training or internship with an electrical engineering firm. At the end of the on-the-job training, the engineering firm hired employee on a full-time basis at an hourly wage of $8.50. After a year his hourly wage had been increased to $8.65.[1]

Employee sought economic recovery compensation, contending that his post-injury employment was not "suitable" within the meaning of Minn.Stat. § 176.101, subd. 3e(b). The evidence showed that an entry-level CAD operator is paid $7.50 to $9 per hour; that with two years' experience a CAD operator could expect to earn $10 to $12 per hour, and after five years an hourly wage of $12.19. The QRC testified that with further training in design work, the employee could earn up to $15 per hour. When asked if this work offered an opportunity to restore employee "as soon as possible and as nearly as possible to employment that produces an economic status as close as possible to that which he would have enjoyed without his back disability," the QRC responded: "Yes. Within the next three to five years." The employee contends that if it takes three to five years in this new occupation to return him to his established preinjury earning capacity, it is not "3e" employment. The compensation judge agreed, but the WCCA reversed on appeal.

It appears that the WCCA does not regard disparity between pre- and post-injury wages as dispositive with respect to the suitability of a job for purposes of determining whether permanent partial disability benefits should be paid as economic recovery compensation or impairment compensation. Indeed, in this

---

1. At the time of injury, Gackstetter was earning $12 an hour plus time-and-a-half for 5 to 10 hours of guaranteed overtime for an average weekly wage of $643. He received temporary partial compensation when he began his CAD work with the engineering firm.

case the WCCA took the position that because the employee's job as a CAD operator was consistent with his rehabilitation plan, it was a "suitable" job within the meaning of Minn.Stat. § 176.101, subd. 3e(b), and it seems to have treated wage disparity as irrelevant.[2]

■ Minn.Stat. § 176.101, subd. 3e(b) provides, however, that "suitable" or "3e" employment must not only be consistent with an approved plan of rehabilitation but that it must also meet the requirements of section 176.102, subd. 1.[3] It was this intertwining of sections 176.101, subd. 3e(b) and 176.102, subd. 1 that prompted us to say in *Jerde v. Adolfson and Peterson,* 484 N.W.2d 793, 795 (Minn.1992), that it "appears the legislature intended that a subdivision 3e job be one reasonably likely to accomplish appropriate rehabilitation objectives"—that is, a job that returns the worker, as closely as possible, to an established preinjury economic status. It is apparent, then, from the provisions of these two sections of the Workers' Compensation Act that although a disparity between pre- and post-injury wages is not the sole criterion, it is a significant factor in determining the "suitability" of post-injury employment. In addition, of course, as we held in *Keklah v. Gebert's Floor Coverings,* 511 N.W.2d 437 (Minn.1994), the employee's age, education, interests, aptitudes, skills, whether the employee has participated in a retraining program, and the employee's general work history are factors which enter into the equation.

■ At the same time, the legislature has recognized the obvious: that it is highly unlikely that within 90 days after completing a retraining program a worker could earn a wage for performing an entry level job in an occupation in which the worker has no prior experience equal to that which the worker earned as an experienced employee in a different occupation.[4] Most workers realize the economic potential of their occupation only over a period of years. Certainly, the opportunity for enhanced earnings lies in the future when, as in the present case, additional training in design work is necessary if the employee is to enjoy the full economic potential of his new occupation as a CAD operator. We are of the opinion that where the parties adopted a retraining plan, knowing the general characteristics of the occupation for which the employee was being retrained and that after the employee has gained some experience in the new occupation, supplemental training would be necessary to qualify the employee to bring his earnings into a satisfactory proximity to his preinjury earnings, the claim for economic recovery compensation was premature. If, as in this case, the evidence demonstrates that it will take some time and additional training to accomplish the rehabilitation goal, disposition of the claim of entitlement to economic recovery compensation[5] should await the completion of the process.

2. "If the job resulting from rehabilitation is consistent with the [rehabilitation] plan, then it would have satisfied that goal. As a result, if the plan is appropriate and the job is consistent[,] then the resultant job is 'suitable' * * * the relative disparity in [pre- and post-injury] wages is not dispositive in suitable job cases." *Gackstetter v. Coca Cola,* —— Minn. Workers' Comp.Dec. —— (WCCA filed May 17, 1993), slip op. at 5.

3. Minn.Stat. § 176.102, subd. 1(b) provides as follows:

Rehabilitation is intended to restore the injured employee so the employee may return to a job related to the employee's former employment or to a job in another work area which produces an economic status as close as possible to that the employee would have enjoyed without disability. Rehabilitation to a job with a higher economic status than would have occurred without disability is permitted if it can be demonstrated that this rehabilitation is

necessary to increase the likelihood of reemployment. Economic status is to be measured not only by opportunity for immediate income but also by opportunity for future income. * * * *

4. The last sentence of Minn.Stat. § 176.102, subd. 1, provides that:

Economic status is to be measured not only by opportunity for immediate income but also by opportunity for future income.

5. The progressively increasing insistence of injured workers on entitlement to economic recovery compensation is understandable in view of the ever-widening gap between amounts payable as economic recovery compensation, which is based on a percentage of the employee's weekly wage at the time of injury, and those amounts payable as impairment compensation, which is a statutorily fixed amount that has remained un-

It also seems to us that sufficient time has now elapsed that the compensation judge could evaluate the extent to which the rehabilitation objectives have been achieved. Therefore, we reverse the decision of the WCCA with directions to remand the matter to the compensation judge to determine whether the rehabilitation process should be extended to permit additional training and, if so, when the process should be completed so that it can be determined whether the employee's job has attained a "3e" status or whether the employee is entitled to economic recovery compensation.

Reversed and remanded.

Employee is awarded $400 in attorney fees.

changed since adoption of the two-tier system in 1983.